UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

        -against-

JIAN GUO CHENG                              16 Cr 272 (CBA)

        Defendant.
-----------------------------------------------------------x


## SENTENCING MEMORANDUM ON BEHALF OF
## DEFENDANT JIAN GUO CHENG


JOYCE C. LONDON, ESQ.
JOYCE C. LONDON, P.C.
59 Maiden Lane, 6th Floor
New York, NY 10038
(212) 964-3700
Email: jlondonlaw@aol.com

*Attorney for Defendant*
*JIAN GUO CHENG*



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     v.                                           16 Cr 272 (CBA).

JIAN GUO CHENG,
          Defendant
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## SENTENCING MEMORANDUM ON BEHALF
## OF DEFENDANT JIAN GUO CHENG

This sentencing memorandum is submitted on behalf of defendant Jian Guo Cheng ("Cheng") to present legal objections to the Pre-Sentence Report ("PSR") and other factors pursuant to 18 U.S.C. § 3553(a) in support of a sentence below the advisory guideline range. Cheng respectfully requests that this Court exercise its discretion to impose a sentence "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. § 3553(a).

## I.    **BACKGROUND**

Cheng is a 36 year old man born and raised under repressive and impoverished conditions in China. His father fled China and sought asylum in the United States when Jian Guo was around age 13. Seven years later, the father successfully petitioned for his wife and children to relocate to the United States and reside with him. Cheng has received minimal education but has consistently worked throughout his adult life and been a responsible care-giver for his family. For much of his life in the United States, he has been an active informant working with Immigration and Customs Enforcement ("ICE") agents. However, one negative factor has

1

permeated his life over a nine-year period from around 2004 to late 2013 or early 2014, namely

the influence of a Chinese "dai lo" or gang boss named Qian Zheng ("Cash") who recently pled

guilty to racketeering charges in the related matter of <u>United States v. Qian Cheng</u>, 15 Cr 628

(CBA).

## II.  THE PRE-SENTENCE REPORT

Objections to the Pre-Sentence Report ("PSR") were submitted to the Probation

Department by letter dated April 27, 2017.  A copy of this letter is attached hereto as Exhibit A.

1)  <u>Factual Objection</u>

The primary factual objections relate to the case pending in the Kings County Criminal

Court in which Cheng is charged with three misdemeanor counts of assault, harassment and

menacing.  <u>See</u> PSR¶ 56.[1]

Significantly, at the time this incident occurred, Cheng was also cooperating with the

government and was a potential witness in the matter of <u>United States v. Kai Huan Huang</u>, 15 Cr

628 (CBA).  Although the PSR relates this incident to the cooperation of the son of the

complaining witnesses, that is disputed.  Rather, the altercation related to the operation of a

gambling parlor which was run by the two complaining witnesses, Li Guo, (a/k/a  "Uncle") and

Li Rong, (a/k/a "Aunty") and others.  While Cheng was in immigration custody after his arrest,

his wife had become a 10% silent partner in one of the gambling parlors owed by Uncle and

Aunty. She was expected to bring friends and others to that gambling parlor on a routine basis.

---

[1]  Given the extraordinarily detailed report of this pending misdemeanor case, the extraordinarily prejudicial nature of the detail for Cheng, and its correlation to Cheng's loss of both his bail and his cooperation agreement, the following detailed defense rebuttal of these charges should be part of the record.

After Cheng was released on bail, he strongly discouraged her involvement in this gambling parlor. Although she did not entirely discontinue her involvement, it was considerably lessened. This, in turn, provoked Aunty to call her repeatedly and sharply upbraid her.

On the night in question, the night of Thanksgiving, Cheng got out of work earlier than usual. Before heading back to Brooklyn, he called a friend whom he knew would be coming back to Brooklyn for Thanksgiving in order to have a quick meeting with him and to get from him the contact information for an individual which had been requested by the FBI as part of his ongoing cooperation. He reached his friend who offered to meet Cheng at his home but, given the purpose of the meeting, Cheng did not want to meet this individual at Cheng's home so arranged to meet him on a given street near Cheng's home. While waiting there for this individual, Cheng decided to go upstairs to a second floor gambling parlor which he knew was owned by Uncle, Aunty, and others and to ask for Aunty's phone number so he could call her himself and tell her to leave his wife alone. A witnesses interviewed by the defense contradicts most of the account of what happened inside that gambling parlor although it is acknowledged that Cheng raised his voice and shouted at Aunty when she arrived there.[2]

Thereafter, Cheng left that gambling parlor and went downstairs to wait for his friend to arrive. He was waiting inside a video game store watching some players when two individuals (Uncle and one of his followers with the street name "12") entered the video game store, sneaked up behind Cheng and both began to savagely attack him.[3] Employees of the video game store

---

[2]     This witness has been threatened with repercussions if he/she contradicts the account given by Aunty and Uncle's employee who was working there at the time. Specifically, Uncle told her "My son works for the feds. You better do what I say."

[3]     The video game store surveillance system captured this brutal attack on video.

broke up the fight and ordered the three to leave.  According to several defense witnesses, there was no further physical altercation on the street, although Uncle and Cheng were yelling at each other.  Defense witnesses have also acknowledged that at no time did Cheng strike Aunty.  Rather, according to the same witnesses, Uncle had several of his "followers" on the street with him and when the they heard the police sirens, both Uncle and the followers yelled at the wife to lie down and pretend to be hurt.

Cheng was arrested.  He requested medical attention but the arresting officers declined to take him to the hospital.  Both Uncle and Aunty were taken to a nearby hospital.  According to their medical records, their account of the incident is grossly exaggerated (e.g. Uncle claims to have been unconscious for an hour!)

Cheng is not asking for a hearing with respect to these facts as the case is to be resolved in the very near future in Brooklyn Criminal Court and they do not affect the guidelines calculations.  However, in light of the disputed facts, it is respectfully requested that the Court not consider this matter in determining an appropriate sentence for Cheng. [4]

2.    Legal Objections

a)    Neither John Doe #1 nor John Doe #3 suffered serious bodily injury or bodily injury

Paragraph 29 of the PSR accords Cheng a three-level enhancement for a degree of injury between bodily injury and serious bodily injury for Jon Does #1 and #3 with respect to Count 1A.

Based upon information provided in the PSR, John Doe #1 suffered no injury whatsoever.

---

[4]    The government moved to revoke both Cheng's bail and his cooperation agreement based upon the fact that he initiated contact with individuals with whom he should not have such contact and based upon the fact that his bail conditions required him to go straight home from work.  These facts are not disputed.

4

He was simply "pushed" by Cheng inside the gambling parlor. PSR ¶ 10. There are no records indicating that he received medical treatment either at that time or subsequently.

With respect to John Doe #3, the PSR states that "they knocked John Doe #3 to the ground and beat him until he lost consciousness." PSR ¶ 12. John Doe # 3 was taken to Lutheran Hospital. Medical records, however, do not reflect that he ever lost consciousness.[5] Rather the medical reports note that he was "found down, intoxicated" with marks on his body from a possible assault. Apparently, at all times, he was coherent and responsive when questioned and had "no complaints." He suffered no serious bodily injury although abrasions to his left forehead and posterior scalp were noted as well as bruising on his left shoulder and abdomen. He further stated that he was not in any pain. He was discharged from the hospital about two hours after admission with no medications prescribed or given upon discharge.

Based on John Doe #3's statements and medical records, there is evidence that he was in a drunken stupor rather than unconscious.

The Guidelines define "serious bodily injury" as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ or mental faculty; or requiring medical intervention such as surgery, hospitalization or physical rehabilitation." USSG §1.B1.1, n. 1(I). John Doe #3's medical records make not mention of extreme physical pain or the protracted impairment of a function of a bodily member, organ or mental faculty. Nor did John Doe #3 require hospitalization, surgery or physical rehabilitation.

"Bodily injury" is defined as "any significant injury' e.g, an injury that is painful and

---

[5]     Counsel has received a copy of John Doe #3's medical records (58 pages) and will provide the Court with a copy if the Court so requests.

5

obvious, or is a type for which medical attention ordinarily would be sought." USSG 1B1.1, n. 1(B).

Based upon these definitions and the medical records of John Doe # 3, it is respectfully submitted that there should be no three-level guideline enhancement based on injury that falls between serious bodily injury and bodily injury. Similarly, it is further submitted that there should not be a two-level enhancement for bodily injury based upon John Doe #3's medical records.

b)    Restitution

Paragraphs 13 and 93 of the PSR state that John Doe # 1 is entitled to restitution of $4,040, consisting of"

-        $2,600 (medical expenses relating to physical or emotional injury)

-        $1,440 (lost income)

These amounts are not supported by any corroborative documentation. See PSR ¶ 13. According to the PSR, John Doe #1 was pushed. Without documentation corroborating that John Doe #1 sought medical treatment for any purported emotional or physical injury, these restitution claims should not be credited. Further, in the unlikely event that John Doe #1 did seek medical treatment for being pushed, documentation verifying that he actually paid the claimed amount should be provided. Additionally, in the unlikely event that John Doe # 1 was unable to continue working in the illegal gambling parlor for a period of time, he has provided no proof that he was unable to work for a period of time because he was pushed. Moreover, he should not be compensated for los of employment in an illegal business.

With respect to John Doe # 3, paragraphs 13 and 93 of the PSR state that John Doe #3 is

6

claiming restitution in the amount $12,300 consisting of:

- $1,300 (lost or damaged property)

- $2,000 (medical expenses)

- $9,000 (lost income)

Again there is no corroborative documentation for these claims. Although, John Doe #3 was taken to a hospital and treated as an out-patient, there is no documentation showing that he actually paid for the medical services he received or the actual cost of these services.[6] Without such documentation, he should not receive compensation for medical expenses if he did not lay out the money for the treatment he was provided.

With respect to the claims for property damage and lost income, there is no verification for these claims and John Doe #3 should not receive compensation for property damage or lost income from an illegal business.

Accordingly, without adequate verification of the restitution amounts claimed by John Doe #1 and John Doe #3, restitution should not be directed.

## III.   AN EXAMINATION OF THE 18 U.S.C. § 3553(a) FACTORS MAKE CLEAR THAT A NON-GUIDELINES SENTENCE IS APPROPRIATE

In imposing sentence, this Court must consider the factors set forth in 18 U.S.C. § 3553(a), which include:

(1)   the nature of and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed –

---

[6]   The medical records indicate that John Doe # 3 was treated at a "sliding fee-charity care MCD rate."

7

A.   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

B.   to afford adequate deterrence to criminal conduct;

C.   to protect the public from further crimes of the defendant; and

D.   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)   the kinds of sentences available;

(4)   the advisory Guidelines range;

(5)   any pertinent policy statements issued by the Sentencing Commission;

(6)   the need to avoid unwarranted sentence disparities; and

(7)   the need to provide restitution to any victims of the offense.

*Id.* After considering all of those factors, this Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2)." *Id.* (Emphasis added).

1.   **Background to the Charged Offense**

Several years after arriving in the United States and while still working for his father, Cheng began frequenting Chinatown gambling parlors in his free time. There, he became acquainted with Qien Zheng ("Cash"). Cash, at that time, was working with ICE as an informant and encouraged Cheng to meet with his ICE handlers and likewise become an informant around 2004 - 2005. Impressed by Cash's aura of wealth and at Cash's urging, in 2004, Cheng and a partner started a bus route from Chinatown, New York to Rhode Island and subsequently a second bus route from New York to Waterbury, Connecticut but immediately became involved in the fierce competition which permeated this unregulated, lucrative industry. Rivalry between

8

competing vans and buses was pervasive and all too often the line between competition and extortion became blurred and Cheng's business plan rapidly dissolved into a scheme to extort, resulting in two Southern District of New York indictments.

After Cheng's release from custody in 2011, and again at Cash's urging, Cheng renewed his association with the ICE agents. However, since the agents handling both Cash and Cheng did not speak Chinese and since Cheng did not speak English, the agents generally called in Cheng and Cash together. Cash insisted that Cheng provide him first with any information that Cheng had for the agents. Cash would then meet first alone with the agents, provide them with the information and then later bring in Cheng to verify it. In return, Cash, an American citizen, promised Cheng that he (Cash) would be able to prevail upon the agents to permit Cheng to remain in the United States and avoid deportation. Then, Cash, in keeping with his moniker, would demand from Cheng a "cash" payment (which he termed a "loan") for his services. Over the next three or so years, Cash received "loans" of around $70,000 from Cheng with Cheng borrowing heavily from his wife and other family members to meet Cash's demands. If money was not forthcoming when Cash demanded it, Cash would tell Cheng that he, Cash was "a gold medal snitch" and could have him and his wife deported.

As a result of the constant financial pressure from Cash, and as one of Cheng's followers, Cheng became associated with several of Cash's gambling parlors. The conduct to which Cheng has pled guilty and the related conduct for which he is to be held responsible at sentencing both occurred in 2013 in the course of these activities.

By early 2014, Cheng became very concerned that his current lifestyle and the financial demands of Cash were destined to end badly, both financially and perhaps criminally, at least for

him, since Cash seemed to have a charmed life. His dilemma was that he did not know how to extricate himself from Cash and was extremely fearful that Cash actually had sufficient "clout" with law enforcement to have him deported. Finally, in early 2014, he sought legal guidance from present counsel who contacted an ICE supervisor, explained the situation, and requested that Cheng no longer be interviewed with Cash as his interpreter. Additionally, Cheng was instructed to notify counsel whenever he met with ICE agents and to inform counsel of the information he was providing. Cheng was further instructed by counsel to have no further contact with Cash, either in person or by telephone. Several weeks later, counsel was contacted by the ICE supervisor and advised that both Cash and Cheng were to be dropped as ICE informants. However, until the time of Cheng's arrest by DHS in December 2015, the agents continued to contact him and/or counsel to ask if Cheng could provide them with information about certain individuals or incidents. This Cheng willingly did.

Thus, by early 2014, Cheng had severed virtually all contact with Cash - a wise decision as Cheng was not indicted in the December 2015 indictment charging Cash and others with participating in a racketeering organization. However, Cheng was arrested at the same time as Cash and his co-defendants on an immigration warrant. He was placed in immigration custody to await deportation.

2. **Cheng's Cooperation**

a) Cooperation with DHS

Over the ten years or so that Cheng worked as information for ICE, he was routinely asked to provide information on certain individuals whom ICE was investigating. Primarily, this included, but was not necessarily limited to, obtaining contact information such as place of

residence, employment details, locations where individuals ate, socialized or just "hung out", and when possible, photographs.

In October 2014, an entire family in Albany was murdered, including their two children. Cheng knew this family as they came from the same village in China. At the request of ICE agents, he traveled to Albany and was able to obtain significant information regarding the background to the murder and the killers. In the months before he was discontinued as an informant, Cheng was also providing ICE with information about a large-scale credit card fraud scheme  - information which he also subsequently detailed in the course of his cooperation in the instant matter. Significantly, with respect to Cheng's cooperation after he was released from custody in early 2011, he never received any credit towards a sentencing reduction in a criminal matter and never received any payment for his ongoing services. The Court is respectfully asked to credit this cooperation in determining a just sentence for Cheng.

      b)      Cooperation with EDNY

In an attempt to avoid deportation and remain in the United States with his family, Cheng sought to cooperate in Cash's case after his arrest. Over the next several months, Cheng attended proffer meetings at which he reluctantly admitted his involvement in the charge to which he pled guilty and acknowledged his involvement in the second incident for which he is to beheld responsible  at sentencing. He was offered a cooperation agreement which included the opportunity to cooperate pro-actively after his sentencing and thus be able to remain in the United States for as long as he was actively cooperating. He was thus able to make bail in both immigration court and on the instant matter.

Even though Cheng's association with Cash ended almost two years before Cash's arrest,

11

Cheng's long association with him provided useful information regarding Cash's very long history of extortion, his operation of illegal businesses, persons who worked under him and related matters. Although Cheng did not testify at the trials of Cash's co-defendants, he was a potential witness at the trial of Cash, were Cash to proceed to trial. However, as a result of his bail violation and unauthorized contact with individuals whom he should not have an association, his bail was revoked and eventually, his cooperation agreement was rescinded so he will not receive the benefit of a 5K letter. Nevertheless, the government did receive the benefit of Cheng's information regarding his association with Cash and the Court is asked to consider this in determining an appropriate sentence for Cheng.

3.    Cheng's Personal and Family Circumstances

Cheng, now aged 36, was born in China and raised in poverty. After Cheng's younger brother was born, the family was in violation of China's one-child policy. As a result his father learned that he was to be arrested and incarcerated, but was able to flee to the United States before his arrest, leaving behind Cheng, his mother and his brother. When local officials learned that the father had fled, a contingency of local officials came to the family dwelling and proceeded to destroy it. Cheng watched as the only home he had even known was demolished - windows shattered, the roof torn off and the walls hacked down. Cheng, his mother and his brother lost the few possessions they had and went to live with relatives.

Cheng's father provided financial support for the family from the United States. When able, he applied for and was granted political asylum and then proceed to petition for his family to join him in the United States, However, Cheng was already 21 by the time he arrived in New York City.

12

As noted in the PSR, Cheng has had limited schooling - three years of formal education. As a result, he is barely literate. Upon his arrival in the United States, he worked in various restaurants as a cook, and then worked for his father who was in the business of making wonton skins.

After distancing himself from Cash, Cheng then worked as the manager of a video game store in Chinatown until his arrest by immigration authorities in December 2015. Subsequently, while out on bail, he worked consistently at his aunt's bodega and complied with all the conditions of his bail until the fateful night of Thanksgiving, 2016. See supra. He now awaits sentencing and the certainty of deportation.

Cheng has two sons, aged 10 and 9, with his first wife, a common-law relationship. Both his ex-partner and the two boys reside with Cheng's parents in Chinatown, Manhattan as Cheng's ex-partner is too ill to care for the boys by herself. She suffers from kidney disease which has been gradually worsening. Given her lack of medical insurance and immigration status, she is not a candidate for either dialysis or a kidney transplant. Over the years, she has primarily depended on Cheng for support.

For the past seven years, Cheng has been in a common-law relationship with his second partner They have one son, aged one year - born on the day that Cheng entered a guilty plea in the instant matter.

As is evident in letters to be submitted on Cheng's behalf, Cheng has been a good parent to his children, providing for them financially and has been an active participant in their lives. He has also been a very supportive of his elderly parents both of whom have health problems. See also PSR ¶ ¶ 59-60.

While in custody at the MCC, Manhattan, Cheng has incurred no disciplinary infractions and has completed at least one course - a forty-hour drug abuse education course. A copy of the certificate he received is attached hereto as Exhibit B.  Because of his inability to speak English, Cheng's opportunity to work and take other courses while at MCC has been limited. His inability to speak English has also resulted in other social and "quality of inmate life" hardships. For most of the seven months at the MCC, he has been housed on a floor with no other Chinese-speaking inmates. He cannot watch television, he cannot communicate effectively with others and given his limited literary skills, he is unable to take advantage of the inmate email system. He has thus been socially isolated throughout much of his incarceration at MCC.

Additionally, because of his inability to communicate in English and his inability to use a computer, he has limited access to medical treatment.  Several weeks ago, he suffered an eye infection but was unable to get treatment as he could not complete the necessary online medical treatment request.  Even after the intervention of counsel with the legal department, he remained untreated.  The condition has eventually resolved.  Currently he is suffering from ulcers and abdominal pains, but again has been unable to file the necessary online requests in order to obtain treatment.

## IV.    A REASONABLE SENTENCE

It is respectfully submitted that given all the facts and circumstances of this case, as detailed herein and in the PSR, a sentence of time served would constitute a reasonable sentence.

Under the guidelines as presently calculated, Cheng has a guideline sentencing range of 51 - 63 months. If Cheng's objections to the Pre-Sentence Report are credited, his guideline sentencing range would be lowered to 37-46 months.  Using a 46 month guideline sentence as a

14

base, with an allowance for good time, he would be required to serve approximately 39 months. Using a 37-month guideline sentence as a starting point, he would be required to serve 31 months.  By the time of sentencing, he will have served eight months in federal custody.  This time was preceded by six months in immigration custody throughout which time Cheng was actively proffering with the government and working towards a cooperation agreement. We therefore request that the Court credit the six months in immigration custody towards the sentence to be imposed in this matter.  With the crediting of this time, Cheng would have served 14 months.

However, in light of the following 18 U.S.C. § 3553(a) factors:

- Cheng's 10-year history of working as a voluntary informant for ICE without receiving compensation or credit for this work;

- his proffering of information and cooperation with the government in this matter;

- the fact that he has been charged with in the instant matter solely as a result of his desire to cooperate with a view to being able to avoid or delay deportation;

- the proactive steps he took to dissociate himself from involvement with Cash and his associates almost two years before he was arrested on the immigration warrant; and

- the fact that his deportation is now a certainty

it is respectfully submitted that a sentence of time served would constitute a just and reasonable sentence for Cheng

15

## V.   **CONCLUSION**

For all the reasons set forth herein, it is respectfully submitted that a sentence of time

served should be imposed and no restitution accorded to John Doe # 1 and John Doe # 3.

Dated: New York, New York
       June 22, 2017

Respectfully submitted,

/s/

Joyce C. London
JOYCE C. LONDON, P.C.
59 Maiden Lane, 6th Floor
New York, NY 10038
Tel: (212) 964-3700
Email: jlondonlaw@aol.com

*Attorney for Defendant*
*JIAN GUO CHENG*

16

# EXHIBIT A

# JOYCE C. LONDON, P.C.
### ATTORNEY AT LAW
59 MAIDEN LANE, 6TH FLOOR
NEW YORK, NY 10038

Tel: 212 964-3700                                          Fax: 212 566-7501
Email: jlondonlaw@aol.com

April 26, 2017

**By Email**
Ms. Cheryl M. Fiorillo
United States Probation Officer
Eastern District of New York
147 Pierrepont Street
Brooklyn, NY 11201

Re:     United States v. Jian Guo Cheng,
        16 Cr 272 (CBA)

Dear Ms.Fiorillo:

I have received a copy of defendant Jian Guo Cheng's Pre-Sentence Report ("PSR") and have reviewed it with Mr. Cheng.  We have the following objections to the PSR:

1.     Paragraphs 13 (Victim Impact) and 93 (Restitution)

Defendant contests these loss amounts.

Based on facts currently reported, John Doe # 1 was pushed.  Since there is no corroboration of the physical injury or emotional injury, including but not limited to medical reports and/or medical bills for John Doe # 1, this victim impact loss of $2,600 should not be credited.  With respect to John Doe # 1's lack of $1,440 of income, John Doe # 1 is a partner in the gambling parlor in question.  Since the lost income appears to be a loss of income from an illegal operation, he should not be entitled to loss of income from criminal conduct.

Similarly with respect to John Doe # 3.  If the uncorroborated property damage he is claiming relates to property damage to the furnishings in his illegal gambling parlor, he should not be entitled to restitution for the alleged property damage.  Unless, John Doe # 3 produces medical expenses relating to his physical or emotional injuries, the reported losses should not be credited.  Similarly, Jon Doe # 3 is not entitled to restitution for lost income if that the lost revenue was revenue from his illegal gambling parlor.  Without corroboration of the losses claimed, John Doe # 1 and John Doe # 3 should not receive restitution.

**U.S. Probation Officer Cheryl Fiorillo**                                  **April 26, 2017**

**Note**: As per Mr. Cheng's plea agreement, Mr. Cheng does not contest the agreed upon forfeiture amount of $5,000.00.

2.      Paragraph 29

Based on the facts presented, there appears to have been no bodily injury to John Doe #1. Secondly, we submit that there was either no injury or only bodily injury to John Doe #3.

3.      Paragraph 50

Defendant does not recall ever being in Bethlehem, PA or having a case in that district.

4.      Paragraph 56

Defendant disputes the many of the facts underlying this arrest.

5.      Paragraph 64

This paragraph states that Mr. Cheng's sons have no known health issues.  However, as stated in paragraph 65, Jimmy continues to suffer from occasional pain, dizziness and vomiting as the result of being the victim of a hit and run accident in Chinatown.  According to the hospital records, Jimmy suffered a concussion of unknown duration.  He was diagnosed with a traumatic subdural hematoma and calvarial (skull) fracture.  (A copy of his medical report is attached hereto for verification purposes).

6.      Paragraph 66

Mr. Cheng's wife was not working after the birth of their son while he was out on bail. Since the revocation of Mr. Cheng's bail on December 1, 2016, she has been working as a waitress in a friend's restaurant.

7.      Paragraph 67

For clarification purposes: Mr. Cheng was arrested and held in immigration detention on December 15, 2016.  On May 23, 2016, he was brought into federal custody and pled guilty to the instant charges on that date.  Bail was set for him but he was then returned to immigration custody and released on bail from immigration custody on June 9, 2016.

8.      Paragraph 68

Mr. Cheng has been unable to work or take classes since his remand on December 1, 2016 as he does not speak English and he is housed at the Metropolitan Correction Center on a

2

**U.S. Probation Officer Cheryl Fiorillo**                    **April 26, 2017**

floor where there are no other Chinese speaking inmates.  He cannot even request medical attention or fill out the requisite forms.  He is, in fact, totally isolated on that floor.

Very truly yours,
/s/
Joyce C. London

3

# EXHIBIT B

# United States Department of Justice
# Federal Bureau of Prisons

## JIAN CHENG

has satisfactorily completed the
requirements for the forty hour
**DRUG ABUSE EDUCATION COURSE**
and is hereby awarded this

# Certificate of Achievement in Drug Education

_____  4/28/17  _____
**D. A. P. Coordinator**  **Date**  **Drug Treatment Specialist**

© 1998 GOES 3912  LITHO. IN U.S.A.