

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MKM:NEM/MCM
F. #2015R00888

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 29, 2017

## TO BE FILED UNDER SEAL

By Hand Delivery

The Honorable Carol Bagley Amon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Jian Guo Cheng
                 Criminal Docket No. 16-272 (CBA)

Dear Judge Amon:

      The government respectfully submits this letter in advance of sentencing in the above-referenced case, which is scheduled for July 20, 2017. For the reasons discussed below, the government respectfully requests that the Court impose a sentence of at least 63 months, which is the bottom end of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") imprisonment range of 63 to 78 months, as calculated by the government.

I.    Background

      A.    The Charged Conduct

      In approximately 2013, Jian Guo Cheng, also known as "Yi Zuo," (the "defendant") loaned a few thousand dollars to an individual referred to herein as Jane Doe. Jane Doe had to pay the defendant between $300 and $500 per week in interest on the principal of the loan. After paying the interest to the defendant for a number of months, Jane Doe asked the defendant if she could cease making interest payments. The defendant insisted that she continue to make weekly interest payments to him. Jane Doe struggled to make payments to the defendant. On multiple occasions, the defendant went to Jane Doe's gambling parlor and demanded money from her in a loud and aggressive manner. On May

3, 2013, the defendant went to Jane Doe's gambling parlor to collect money from Jane Doe. An individual at the parlor, herein referred to as John Doe 1, told the defendant that Jane Doe was not there. The defendant became incensed, yelled at those present in the parlor, shoved John Doe 1 and another individual (herein referred to as John Doe 3) and flipped Mahjong tables.

The defendant then left the parlor and called Xin Lin, also known as "Blackie," so that they could beat one of the men who had "disrespected" him. Lin, Kai Huan Huang, also known as "Shen Shen," Xue Jiang Gao, also known as "Xue Zhang," and other members of the Zheng Organization arrived. Shortly thereafter, John Doe 3 left the gambling parlor. The defendant, who was then standing outside of the gambling parlor, pointed to John Doe 3 and told Lin and the others that they needed to teach him a lesson. The defendant and the other men then beat John Doe 3, both punching and kicking him, to the point of unconsciousness. A bystander called the police and John Doe 3 was taken to the hospital. According to John Doe 3's medical records, he had boot marks on him, was bleeding from the face and had numerous bruises and abrasions to his face, chest, shoulder, abdomen and pelvis. (See Presentence Investigation Report ("PSR") ¶¶ 10 – 11.) A photograph of John Doe 3 after the assault is attached hereto as Exhibit A.

Later that year, the defendant was again having difficulty collecting a debt owed to him. The defendant sought help from Qian Zheng, also known as "Cash," who told the defendant that he could use some of his underlings, including Huang and Jiang Gao, to collect the money. The defendant, Huang and Jiang Gao went to a gambling parlor where the defendant expected to find the debtor, John Doe 2. Inside the parlor, the defendant demanded that John Doe 2 repay the money. Huang slapped John Doe 2 in the face. The defendant threatened to send John Doe 2 to the hospital and explained that Huang and Jiang Gao were there as a warning to him. A few days later, Huang went back to the gambling parlor and accepted payment from John Doe 2 on Cheng's behalf. (PSR ¶ 12.)

B.   The Defendant's Post-Plea Conduct

On May 23, 2016, the defendant pleaded guilty, pursuant to a cooperation agreement, to a one-count information charging him with the May 2013 extortion. Under the terms of the agreement, the defendant also stipulated to his involvement in the late 2013 extortion. Notably, however, while on release after pleading guilty, the defendant surreptitiously continued a life of crime, breaching the terms of his cooperation agreement.

On November 24, 2016, the defendant was arrested for Assault in the Third Degree, Menacing in the Third Degree, and Harassment in the Second Degree. This arrest occurred after the defendant yelled at the mother of an individual who testified before Your Honor in the trial of United States v. Kai Huan Huang, in November 2016. The defendant yelled at the witness' mother about her son's cooperation with the government and called her son a rat. The defendant said, in sum and substance "You're so powerful now motherfucker, your son is a rat, you don't even know how you will die." When the witness' mother attempted to leave, the defendant grabbed her by her jacket and shoved her back inside. He

2

told her "Don't leave, I'm still talking. Why so cocky? Since your son became a rat, you're so cocky that I can't even talk to you." He also directed profanities at the witness' mother. The witness' father and cousin then assaulted the defendant as a result of his altercation with the witness' mother. According to the witness' father, the defendant called individuals to meet him. Once outside, the witness' father felt outnumbered and when the defendant then beat him, he did not fight back.[1] The witness' father was taken to the hospital. He reported dizziness, pain to the right side of his face, ear pain and a headache. His hospital records indicate bruises and tenderness on his face, and a perforated eardrum. Photographs which show the swollen mass below the witness' father's left ear, bruises and lacerations are attached hereto as Exhibit B.

In addition, subsequent to his guilty plea, the defendant also participated in the management of an illegal gambling parlor. A recorded conversation from September 2016, in which the defendant identifies himself by name, reveals the defendant directing the operation of the parlor. For example, the defendant demanded that the parlor workers rotate shifts. ("Four workers need to rotate. Nobody gets early or late shifts. Everybody rotates. This is fair and beneficial for the company.") He also demanded that shareholders who were not adequately contributing be removed. ("Everyone is fucking hiding behind the scene to share money. I fuck your mother! Nobody is fucking coming forward. These shareholders deserve to be and should be kicked out . . . . We run a business. It has nothing to do with having face or not. You know? We run a business. Whoever doesn't gamble needs to be kicked out.") Indeed, one of the other participants to the conversation stated that "Yi Zuo, you are the boss. However you manage us is fine." A transcript of the recording is attached hereto as Exhibit C. The recording, in which the defendant is clearly discussing how to operate an illegal gambling parlor, is also in stark contrast to the defendant's contention that his November 2016 assault arrest stemmed from his attempt to extricate his wife from her participation in an illegal gambling parlor.[2]

In light of this conduct, the government believes that the defendant should be sentenced to a substantial period of incarceration which would appropriately reflect the seriousness of the defendant's criminal conduct, and which would send the message that post-plea criminal conduct will be punished appropriately.

---

[1] The government has interviewed one individual referred to the government by the defendant who claimed to be outside of the gambling parlor on Thanksgiving, and who claimed to have seen no altercation on the street. Further investigation has revealed that this witness lied to the government by denying any prior relationship with the defendant. Contrary to the witness' statements, he previously operated an illegal gambling parlor with the defendant.

[2] The witness' father is the individual referred to as "Old Guo" in the translation. During the conversation, the witness' father notes that unlike the defendant who is a "powerful guy," he doesn't "hang out on the street."

II.        <u>Guidelines Calculation</u>

In the PSR, Probation calculates a total offense level of 22. (PSR ¶ 47.) Included in Probation's calculation is a three-point reduction for timely acceptance of responsibility. (PSR ¶¶ 45-46.) Assuming a criminal history category of III, Probation calculates that the defendant's applicable Guidelines range is 51 to 63 months' imprisonment. (PSR ¶ 82.)

The government respectfully submits that the defendant is not entitled to a three-level reduction in his Guidelines calculation for acceptance of responsibility under U.S.S.G. § 3E1.1. "A defendant who enters a guilty plea is not entitled to an adjustment [for acceptance of responsibility] as a matter of right." <u>Id.</u> Rather, the defendant bears the burden of demonstrating that he qualifies for such a reduction. <u>See</u> <u>United States v. Broxmeyer</u>, 699 F.3d 265, 284 (2d Cir. 2012). Moreover, evidence of acceptance of responsibility "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n. 3.

Here, the defendant has failed to meet his burden of showing that he qualifies for a three-level reduction for acceptance of responsibility. As discussed, after his guilty plea in this matter, the defendant was arrested for assault. The defendant also operated an illegal gambling parlor. Under the Guidelines, a relevant factor in deciding whether a defendant has accepted responsibility is his "voluntary termination or withdrawal from criminal conduct or associations." U.S.S.G. § 3E1.1 application note 1(B)). In addition, the Second Circuit has found that "the fact that a defendant commits a second crime after pleading guilty and while awaiting sentencing for a first offense is a relevant consideration in denying the acceptance of responsibility adjustment in selecting the sentence for that first offense [because] [t]he second crime refutes the disavowal of future criminal activity implied by the guilty plea to the first crime." <u>United States v. Rodriguez</u>, 928 F.2d 65, 67 (2d Cir. 1991) (internal citations omitted); <u>see</u> <u>also</u> <u>United States v. Wimble</u>, 387 Fed. Appx. 63, 64 (2d Cir. 2010) (affirming district court's denial of acceptance of responsibility reduction where defendant "was involved in multiple crimes subsequent to his guilty plea"); <u>United States v. Woods</u>, 927 F.2d 735, 736 (2d Cir. 1991) (affirming district court's denial of acceptance of responsibility reduction and explaining that "continued involvement in criminal activity casts substantial doubt on the sincerity of a defendant's protestations of contrition, and a court is well within its discretion in considering such involvement in setting a defendant's sentence.") The defendant's post-plea conduct is clearly inconsistent with acceptance of responsibility. Consequently, the government does not intend to make a motion for a one-level reduction under § 3E1.1(b) and he is not entitled to a three-level reduction under § 3E1.1.

In light of these facts, the government respectfully submits that the defendant's Guidelines calculation is as follows:

May 2013 Extortion

      Base Offense Level (§ 2E2.1(a))      20

      Plus:   Bodily Injury (§ 2E2.1(b)(2)(A))      +2[3]

Late 2013 Extortion

      Base Offense Level (§ 2E2.1(a))      20

Multiple Count Acts Analysis (§ 3D1.4)

      Highest Adjusted Offense Level      22

      Units:

            May 2013 Extortion (§ 3D1.4(a))      +1 unit

            Late 2013 Extortion  (§ 3D1.4(a))      +1 unit

      Total Units:      2 units

      Levels Added (§ 3D1.4)      +2

      Total      24

---

[3] As noted, the defendant and others beat John Doe 3, causing bleeding from the head and boot marks, bruises and abrasions on John Doe 3's face and body.  The defendant objects to Probation's determination that John Doe 3 suffered injury that can be categorized somewhere between bodily injury and serious bodily injury.  The defendant, however, concedes that John Doe 3 suffered abrasions and bruising as a result of the beating. (Def. Ltr. at 6).  Such injuries are sufficient to support a two-level enhancement for bodily injury. See United States v. Markle, 628 F.3d 58, 64 (2d Cir. 2010) (upholding district court's determination that victims had suffered bodily injury where they were treated at a hospital for their injuries including "an elbow abrasion and tenderness to the thigh" and "bruised ribs, shoulder, jaw and back"); see also United States v. Cerome, 277 Fed. Appx. 85, 87 (2d Cir. 2008) (upholding application of bodily injury enhancement where victim was punched in the face and suffered abrasions and a bruise); United States v. Ledford, 218 F.3d 684, 691 (7th Cir. 2000) (upholding determination that victims suffered bodily injury where one victim "suffered bruising on her side and arm" and the other "suffered a contusion on his chest"); United States v. Brown, 200 F.3d 700, 709 (10th Cir. 1999) (explaining that "[v]isible injuries such as bumps, bruises, and redness or swelling are sufficient to constitute 'bodily injury'"); United States v. Greene, 964 F.2d 911, 912 (9th Cir. 1992) (finding that swollen cheek and pain that resulted from two slaps to the face "amply satisfied the Sentencing Guideline's definition of 'bodily injury'").

5

The government concurs with Probation's determination that the defendant is in Criminal History Category III. Accordingly, the defendant's Guidelines range of imprisonment is 63 to 78 months' imprisonment.

III.　　Legal Standard

In the Supreme Court's opinion in United States v. Booker, 125 S. Ct. 738, 743 (2005), which held that the Guidelines are advisory rather than mandatory, the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence, but also may tailor the sentence in light of other statutory concerns. See 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Id. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

"[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). Indeed, the Supreme Court has held that, on appeal, a Guidelines sentence may be presumed to be reasonable because "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives." Rita v. United States, 551 U.S. 338, 358 (2007). "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general." Id. at 350. Furthermore, Guidelines sentences promote Congress' goal in enacting the Sentencing Reform Act – "to diminish unwarranted sentencing disparity." Id. at 354.

IV.　　Argument

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)); the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation (§ 3553(a)(2)(A)); and the need for the sentence to afford adequate deterrence

6

to criminal conduct (§ 3553(a)(2)(B)), and to protect the public from further crimes or violations of the defendant (§ 3553(a)(2)(C)). For the reasons discussed in more detail below, a sentence of at least 63 months is sufficient, but not greater than necessary, to meet the goals set forth in 18 U.S.C. § 3553(a).

### A. Nature and Circumstances of the Offense

There is no question that the offense to which the defendant pleaded guilty is extremely serious in nature. See United States v. Meyer, 1986 WL 6831, at *3 (E.D.N.Y. May 14, 1986) (noting that extortion is an "extremely serious offense[]"); United States v. Santa, 1986 WL 6832, at *2 (E.D.N.Y. May 6, 1986) (noting that extortion is "a very serious offense"). Here, the defendant showed up at Jane Doe's place of work unannounced. He demanded to see Jane Doe and when he was told that she was not there, he shoved John Doe 1 and John Doe 3 and flipped Mahjong tables. After this, the defendant called his criminal associates and then beat John Doe 3, sending him to the hospital. A few months later, the defendant again used violence and threats of violence to collect money. The nature and circumstances of the defendant's crimes warrant a significant sentence of at least 63 months' incarceration. See 18 U.S.C. § 3553(a)(1)-(2).

### B. The History and Characteristics of the Defendant

In considering the "history and characteristics of the defendant," see 18 U.S.C. § 3553(a)(1), the Court should consider the defendant's additional unlawful conduct. The defendant's history includes multiple prior violent crimes. In 2011, the defendant was convicted in the Southern District of New York of two counts of extortion conspiracy, two counts of extortion, conspiracy to collect extortionate extensions of credit, conspiracy to make extortionate extensions of credit and making false statements. (PSR ¶ 49.) The convictions relate to his extortion of the owners of rival bus companies. During the course of one of the extortion conspiracies, the defendant "assaulted the bus company owner when he refused to pay money to one of the defendant's accomplices." (Id.) The defendant was principally sentenced to time served and three years of supervised release. (Id.) The defendant also has a 2012 conviction in Pennsylvania for disorderly conduct after he shoved a woman. (PSR ¶ 50).[4]

The defendant has also pleaded guilty to Aggravated Unlicensed Operation of a Motor Vehicle, in the Second Degree, after he was found speeding and driving in multiple lanes while intoxicated. (PSR ¶ 51.) Drunk driving is an extremely serious crime and the Supreme Court has noted that drunk driving "is surely a national problem of great concern." Begay v. United States, 553 U.S.C 137, 153 (2008); see also Virginia v. Harris, 558 U.S. 978, 978 (2009) ("There is no question that drunk driving is a serious and potentially deadly crime."). It is very fortunate that the defendant's reckless actions did not end in tragedy.

---

[4] The defendant failed to disclose this conviction to the government during the course of his cooperation.

Defense counsel urges the Court to consider the defendant's assistance to the government and to sentence him to time-served because "the government did receive the benefit of Cheng's information regarding his association with Cash." (Def. Ltr. at 13.) It is clear, however, that the defendant's duplicitous approach here has benefited no one. By continuing to engage in further criminal conduct after his plea, the defendant effectively rendered his proactive efforts and potential value as a historical witness useless. His actions also wasted significant investigative efforts by the Federal Bureau of Investigation and countless hours on the part of this Office.

The defendant also asks that the Court show him leniency because he previously served as an informant for the Department of Homeland Security, Homeland Security Investigations ("HSI"). According to HSI, the defendant served as a source from July 2011 through February 2015. This is a far cry from the defendant's claim that he worked with ICE for over ten years.[5] It was during this time that the defendant committed both the May 2013 extortion and the late 2013 extortion. The defendant also admitted to being a shareholder in an illegal gambling parlor in 2013. The Court may consider the defendant's efforts to provide information to HSI in fashioning an appropriate sentence. However, unlike a traditional cooperator, who provides information to the government and forsakes his prior life of crime, the defendant was simultaneously participating in illegal activity, including acts of violence while serving as an HSI source.

The defendant also claims that he was negatively influenced by Qian Zheng, also known as "Cash." Consensually recorded conversations, as well as the defendant's participation in both the May 2013 and late 2013 extortions, make clear that the defendant was an active participant in the criminal activity of the Zheng Organization. For instance, in 2013, the defendant discussed with Zheng and two cooperating witnesses an assault that Zheng had instructed them to carry out. After Zheng questioned whether the victims were sufficiently injured, the following conversation took place:

> CHENG: Later on, get some kids to go, go with you, just tell them, you can tell them, tell the kids to, if you keep punching Yi Gui he won't be whatever, you know?
>
> CW1: You, he is scared of you. When I saw . . .
>
> CHENG: Beat him up first. Once he is beaten, he will want to resolve this.
>
> CW1: To beat him to, I need to catch him.
>
> CHENG: Right. Beat him first.

---

[5] Notably, the defendant was arrested for extortion in 2006 and imprisoned between October 2008 and January 2011. To the extent that the defendant did provide information prior to his 2006 arrest, he again would have been providing information while, unbeknownst to law enforcement, personally participating in violent crimes.

8

| | |
|---|---|
| CW: | Huh? |
| CHENG: | Beat him up and leave. Just say, "If you don't resolve this, you will get beaten every time I see you. It's simple logic." |
| CW1: | Is that so? |
| CHENG: | That's true! |
| CW1: | Fine. Fine. |

In this conversation, the defendant makes clear how he resolves disputes – with violence. A transcript of this conversation is attached hereto as Exhibit D.

The defendant also contends that in early 2014, after seeing the error of his ways, he cut ties with Zheng and his criminal associates. Consensually recorded conversations tell a different story. For instance, on May 19, 2015 and May 26, 2015, a cooperating witness, who the defendant believed to be one of Zheng's underlings, explained that the defendant had been calling him. In addition, on April 28, 2015, Zheng and a cooperating witness had the following conversation:

| | |
|---|---|
| CW2: | What happened to Yi Zuo? |
| ZHENG: | Huh? |
| CW2: | You mentioned something about Yi Zuo calling you, you didn't pick up. Then he didn't call afterwards. |
| ZHENG: | Did he call you? |
| CW2: | No. What happened to him? |
| ZHENG: | Forget about him. So bad, he is like climbing over my head. |
| CW2: | He is crazy! |
| ZHENG: | He is fucking crazy! He tried to collect the protection fees from me! |
| CW2: | He tried to collect the protection fees from you? How could he collect the protection fees from you? |
| ZHENG: | He wanted to be my Dai Lo. |
| CW2: | No way! |
| ZHENG: | For real! [*Laughing*] Last time, I was about to ask you to get some black guys to beat him up in front of his house. |

9

| | | |
|---|---|---|
| CW2: | | What happened to him? What did he say? |
| ZHENG: | | Huh? |
| CW2: | | How could he dare to do that? |
| ZHENG: | | Hmm. |
| CW2: | | His connection must be very powerful! |
| ZHENG: | | I will cancel all his connections! He thought his connections was very powerful! I will cancel them all! |

Contrary to the defendant's self-serving assertion, he did not cut ties with Zheng and his criminal associates in early 2014, and instead continued his pattern of extortion, this time attempting to extort Zheng. Transcripts of these conversations are attached hereto as Exhibit E.

### C. The Need to Afford Adequate Deterrence and Protect the Public from Further Crimes of the Defendant

Adequate punishment, respect for the law and just punishment all call for a serious sentence of imprisonment. See 18 U.S.C. § 3553(a)(2). A significant custodial sentence of at least 63 months' imprisonment is necessary to demonstrate that those who seek to resolve financial disputes with threats and violence can expect serious punishment for their crimes. A significant sentence of imprisonment will also prevent this defendant in particular from continuing to victimize innocent citizens. See 18 U.S.C. §§ 3553(a)(2)(B) and (C). The defendant's past conduct reflects that specific deterrence is necessary here. The defendant previously committed the very same offenses. In connection with his prior convictions for extortion he received a lenient sentence – time served – given the crimes of conviction. Instead of taking advantage of the chance he was afforded to turn his life around and become a law-abiding citizen, the defendant picked up right where he left off and began engaging in criminal conduct with other gang members while he was on supervised release. This should not be ignored. See United States v. Guerrero, 525 Fed. Appx. 20, 21 (2d Cir. 2013) (upholding above-Guideline sentence where Court relied upon, among other things, the defendant's extensive violent criminal history, the seriousness of the charged conduct, and the fact that lenient sentences in the past had not deterred the defendant from additional criminal conduct).

### D. The Defendant Should Not Receive Credit For Time He Spent In Immigration Custody

The defendant was taken into immigration custody on December 15, 2015, and placed into removal proceedings. The defendant was subject to removal because of his prior extortion convictions. The defendant asks that he be afforded credit for the approximately six months that he spent in immigration custody. Title 18, United States Code, Section 3585 provides that "[a] defendant shall be given credit toward the service of a term of imprisonment

for any time he has spent in official detention prior to the date the sentence commences (1) as a result of the offense for which the sentence was imposed; or (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed; that has not been credited against another sentence." In addition, the Bureau of Prisons Program Statement 5880.28 provides:

> Official detention does not include time spent in the custody of the U.S. Immigration and Naturalization Service (INS) under the provisions of 8 U.S.C. § 1252 pending a final determination of deportability. An inmate being held by <u>INS pending a civil deportation determination is not being held in "official detention" pending criminal charges.</u>

BOP Program Statement 5880.28 at 1–15A (emphasis in original) (citations omitted). Regardless of whether or not the government brought charges against the defendant, he would still have remained in immigration custody for the period of time for which he now seeks credit. Because the defendant was not in "'official detention pending' criminal charges," the defendant is not entitled to credit for the time that he spent in immigration custody. <u>Zavala v. Ives</u>, 785 F.3d 367, 375 (9th Cir. 2015) (explaining that "a defendant is not entitled to sentencing credit" for "detention pending deportation"); <u>Aguila v. Stone</u>, 2017 WL 2197123, at *3 (S.D. Ga. May 18, 2017) (finding that defendant was not entitled to credit for time he spent in "ICE custody for civil deportation proceedings until his transfer . . . to face the indictment."); <u>Paz-Salvador v. Holt</u>, 2011 WL 3876268, at *3 (M.D. Pa. Aug. 31, 2011) (explaining that "[t]ime spent solely in civil or administrative immigration custody pending deportation cannot be credited against a federal sentence as § 3585 only allows credit for time spent in 'official detention' on criminal charges.").

V.  Conclusion

        For the foregoing reasons, the government respectfully requests that the Court impose a sentence of at least 63 months' imprisonment.

        Respectfully submitted,

        BRIDGET M. ROHDE
        Acting United States Attorney

By:   /s/
        Nadia E. Moore
        Maria Cruz Melendez
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Joyce London, Esq.
       Counsel to Defendant

       Ms. Cheryl Fiorillo
       U.S. Probation Officer